**LEWIS BRISBOIS BISGAARD & SMITH LLP**
MARC S. CWIK
Nevada Bar No. 006946
Marc.Cwik@lewisbrisbois.com
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
Telephone: 702.893.3383
Facsimile: 702.893.3789

*Attorneys for Crosscountry Mortgage LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CROSSCOUNTRY MORTGAGE LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>GUILD MORTGAGE COMPANY LLC, a California limited liability company,<br><br>Defendant. | Case No.<br><br>**CROSSCOUNTRY MORTGAGE LLC's COMPLAINT**<br><br>**(JURY DEMAND)** |

COMES NOW, Plaintiff CROSSCOUNTRY MORTGAGE, LLC (hereinafter "CCM"), a Delaware limited liability company, by and through its attorney Marc S. Cwik, Esq. of the law firm LEWIS BRISBOIS BISGAARD & SMITH LLP, and complains and alleges against Defendant GUILD MORTGAGE COMPANY LLC, a California limited liability company, as follows:

**NATURE OF THIS ACTION**

1. CCM is a residential mortgage lender which employs loan originators across the country to sell residential mortgage loans to retail consumers. CCM brings this action for tortious interference, unfair competition, and conspiracy, and seeks injunctive and monetary relief, to remedy the wrongful scheme by Guild, a competing mortgage lender, to induce CCM's employee



4873-2347-1393.2

to breach her contract, duty of loyalty, and other obligations; interfere with CCM's relationships with current and prospective customers; and misappropriate and use CCM's confidential information in order to unfairly compete with CCM.

2. Guild conspired with former CCM Branch Manager and loan originator Mirajoy Casimiro and offered her a lucrative employment package with Guild to persuade her to take massive amounts of CCM's confidential business and client information, and to divert loans in process to Guild to be closed at Guild instead of CCM. Guild orchestrated this scheme while Ms. Casimiro was still being paid and employed by CCM. CCM is aware of numerous loans that were diverted to Guild as a result of Guild's unlawful conduct.

3. CCM's investigation of Guild's wrongful conduct continues; but the facts discovered to date demonstrate that Guild encouraged and facilitated efforts by Ms. Casimiro to abuse her position of trust, exploit information she only learned as a trusted employee of CCM, breach her contract, interfere with CCM's customer relationships, and brazenly violate her duty of loyalty to her employer, CCM.

## PARTIES AND JURISDICTION

4. Guild is a California LLC with its sole member being a Delaware corporation, and CCM is a Delaware LLC with Ohio-resident members.

5. Diversity of citizenship exists between Guild and CCM.

6. Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) for the following reasons: (i) the conduct complained of herein substantially occurred within this judicial district; and (ii) the acts and transactions giving rise to this action occurred in this district because Guild (a) does substantial business within this district; (b) is subject to personal jurisdiction in this district; (c) the harm to CCM was suffered within this district because Ms. Casimiro was, at all relevant times, employed by either CCM or Guild in Las



4873-2347-1393.2                                           2

Vegas and downloaded CCM's confidential materials onto computers physically located in Las Vegas and transferred said materials onto other computers physically located in Las Vegas owned by, or used for the benefit of, Guild.

7. This Court has jurisdiction under 28 U.S.C. §1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.

## FACTUAL BACKGROUND

8. CCM is a nationwide residential mortgage lender that uses a relationship-based strategy to originate loans. CCM has found success in the mortgage industry through its operations model and organizational structure, which includes a corporate office located in Brecksville, Ohio and branch offices located throughout the United States.

9. CCM's branch offices serve the surrounding areas and mainly contain local sales teams made up of salespeople and operations support staff.

10. These branch offices are run by Branch Managers, whose duties include overseeing and building the branch operations, recruiting top loan originators, and managing loan processors and operational staff. This includes oversight of Operations Managers and Loan Officers with the branch.

11. Loan originators are licensed salespeople who source potential borrowers, take loan applications, and quote mortgage rates.

12. Branch Managers and loan originators play a pivotal role in CCM's success. As a result, CCM invests substantial money and time developing its employee base.

13. Branch managers can simultaneously serve as loan originators.

14. CCM also invests substantial time and money to develop its confidential and proprietary information.



4873-2347-1393.2                                    3

15. As one example, CCM's loan originators sign various employee contracts with CCM.

16. Prior to her departure from CCM, Ms. Casimiro served as a Branch Manager of CCM's branch located at 6271 Port Astoria Court, Las Vegas, Nevada. Ms. Casimiro simultaneously served as a loan originator in the same branch. As a condition of Ms. Casimiro's continued employment, CCM and Ms. Casimiro executed an "Originating Branch Manager Employment Agreement," (hereinafter "Employment Agreement") which delineated Ms. Casimiro's various duties to CCM and various restrictive covenants governing her behavior during and after her employ with CCM, a copy of which is attached hereto as **Exhibit 1**.

17. These loyalty provisions and restrictive covenants are meant to ensure that CCM's own confidential and proprietary information is not used against it and that its employees are not working to help competitors to the detriment of CCM while simultaneously employed by CCM.

18. CCM also uses technology to protect its confidential information. For example, employees receive CCM-owned laptops which are encrypted and have multi-factor authentication for remote access. CCM has perimeter security that consists of firewalls and content filtering to detect any intrusion. Data is also encrypted within CCM's proprietary loan origination system which houses consumer data. Additionally, access to data and information is role-based, meaning that only certain tiers of employees are permitted to view certain data and information. CCM has also implemented numerous policies and procedures which address the handling of company and consumer data. Finally, CCM holds frequent trainings regarding security and data protection.

## MS. CASIMIRO'S EMPLOYMENT AGREEMENT

19. Paragraph 1.5 of Ms. Casimiro's employment agreement, titled "Duty of Loyalty," states:

> Employee shall devote appropriate time and attention to his/her activities for and on behalf of Company and shall not engage in any conflict of interest or



conduct which shall reflect adversely upon Company. Employee shall assist and work for only Company and no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services, loan modification services, real estate sales or acquisition, closing, settlement or title-related services, credit repair, credit counseling, borrower assistance or other business or service of the same or similar nature. Additionally, Employee may not own an interest in any entity engaging in any such activities, other than a passive investment of less than one percent (1%), without the prior written consent of Company. While employed by Company, Employee shall not, whether for remuneration or otherwise: (i) serve as an officer, director, or executive of or (ii) be employed or engaged as a consultant, independent contractor, or in any other capacity by, any other business (i.e., through any IRS-W-2, IRS-1099, staffing company, employee leasing, partnership, company affiliation, or other arrangement), except as approved in advance in writing by the President of Company.

20. Paragraph 5.1 of Ms. Casimiro's employment agreement, titled "Protected Information," states:

(a) *Confidentiality*. Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this Article "Protected Information and Restrictive Covenants". Employee acknowledges that all such Confidential Material is in the nature of a trade secret. For purposes of this Agreement, "Confidential Material" means information, which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, (ii) gives Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of Company, or (iii) is designated as Confidential Material by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to Company. Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i) Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company;
(ii) Company personnel names and contact information;
(iii) Employee's compensation arrangements with Company;
(iv) Training and educational materials provided by Company to Employee;



4873-2347-1393.2

5

  (v) Marketing materials and/or marketing plans provided by Company to Employee; and

  (vi) Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

(b) *Non-Disclosure*. As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company. In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

  (i) At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

  (ii) At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

  (iii) Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company, including, without limitation, all materials containing Confidential Material.

21. Paragraph 5.3 of Ms. Casimiro's employment agreement, titled "Restrictive Covenants," states:

(a) *No-Solicitation*. In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, commencing as of the date hereof and for a period of two (2) years following cessation of Employee's employment with Company (the "Limited Period") Employee shall not, directly or indirectly, separately or in association with others,



4873-2347-1393.2  6

interfere, disrupt or damage Company's business by soliciting, recruiting, attempting to recruit, or causing or assisting in the recruitment or attempted recruitment of, any then-current employee of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment with another person or entity.

(b) *No-Hire*. In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, unless prohibited by applicable law, during the Limited Period, Employee shall not, directly or indirectly, hire, attempt to hire, or cause or assist in the hiring or attempted hiring of, any then-current employee, consultant or exclusive independent contractor of Company, or any individual who has served in any such capacity at any time within the twelve (12) month period immediately prior thereto, for employment.

(c) *Solicitation and Re-Solicitation of Borrowers*.

    (i) Employee agrees that (a) Company expends considerable time, money and resources to market to customers, to generate inquiries into Company's loan programs, to develop confidential methodologies to generate consumer interest in Company's loan programs, to maintain ongoing relationships with its customers, to develop and maintain business relationships with referral sources, and to acquire, compile and develop confidential and proprietary customer lists; (b) Company has a legitimate business interest in maintaining relationships and goodwill with current and prospective customers and referral sources and not having those relationships and goodwill unfairly interfered with; and (c) the relationships between Company and its past, present, and future customers, prospects and referral sources, and all rights therein, are and shall remain the sole and exclusive property of Company. Any referral source established by Employee during the term of this Agreement shall be the sole and exclusive property of Company. Employee also hereby expressly acknowledges that the solicitation of, or the origination of a loan for, a consumer for whom a loan previously was processed and closed by Company may result in the imposition against Company of fines, penalties, reimbursements, indemnifications, damages and expenses ("Re-Solicitation Losses").

    (ii) Employee shall under no circumstances solicit, and Employee shall cause the Branch Employees to refrain from soliciting, any consumer for whom a loan previously was processed and closed by Company during the longer of (a) the two (2) year period following the date of such loan closing, and (b) such



period as may be specified in the Applicable Requirements of the pertinent lender or investor with respect to the loan, if such solicitation or loan closing would result in a Re-Solicitation Loss to Company. More generally, Employee shall not during the term of employment and for a period of two (2) years after his/her termination, resignation, or separation of his/her employment relationship with Company for whatever reason, directly or indirectly (whether on Employee's own behalf, working with others, or on behalf of any other person, business or entity): contact, call on or otherwise solicit or communicate with in any way any of Company's past, present or future customers, prospective customers and referral sources with the intention or effect of encouraging such customer, prospective customer or referral source to terminate or reduce the volume of its business with Company or to place any portion of such business elsewhere or otherwise interfere with Company's business.

(iii) Unless otherwise prohibited by applicable law, in the event of any breach of this Section, loans subject to any Re-Solicitation Losses would not be considered an Eligible Loan as defined in Exhibit A and would be subject to Section "Advanced Amounts, Early Pay Offs & Early Payment Defaults" of Exhibit A. Employee further agrees that a violation of this Section, Solicitation and Re-Solicitation of Borrowers, constitutes improper interference with Company's legitimate, actual and prospective business expectations and contractual relations with its customers, prospects and referral sources; constitutes a misappropriation of Company's goodwill; and unfairly and unjustifiably harms Company. Accordingly, Employee agrees that: (a) the damages for improper interference, lost business opportunities, lost goodwill or lost clientele are uncertain and difficult to ascertain and that Company may be required to pay a recapture fee or similar fee to outside investors in the event a customer is refinanced by another lending institution within one (1) year (or longer) of closing a loan with Company; (b) in the event that Employee, directly or indirectly, (on his/her own behalf, working with others, or on behalf of another person, business or entity) solicits or conducts any transactions or business in violation of this Section, Solicitation and Re-Solicitation of Borrowers, then Employee promises, agrees and covenants to pay to Company all revenues that Company would have derived from the origination, funding and sale of the loan for each loan solicited or originated in violation of this Agreement, plus any applicable recapture fee or similar fee paid by Company to its outside investors. Employee agrees that the amount stated in this Section, Solicitation and Re-Solicitation of Borrowers, is the agreed upon reasonable compensation and damages due to

> Company for such a breach, lost business opportunities, recapture fees incurred by Company, and lost goodwill and clientele, and that the stated amount is not a penalty and shall be due and payable by Employee to Company upon demand. It is the Employee's affirmative obligation to determine whether any person with whom he/she (or any person or company/business by whom Employee is employed) has contact is a customer, prospective customer or referral source of Company. In any proceeding to enforce this Agreement, there shall be a legal presumption that any mortgage related product of service provided to any of Company's past, present or future customers, prospects or referral sources by the Employee (or by any other person or company/business by whom Employee is employed) was undertaken and performed in violation of this Agreement.

22. On information and belief, Guild was aware that Ms. Casimiro was bound by the above confidentiality and loyalty provisions. These or similar provisions are standard in the mortgage industry; an industry in which success is determined in part by the safeguarding of confidential information and the maintenance of customer relationships. Guild was therefore on notice that the conduct it was encouraging and abetting by Ms. Casimiro would violate the terms of her contract in addition to her duty of loyalty to her employer.

**MS. CASIMIRO'S RESIGNATION AND CCM'S INVESTIGATION**

23. In the days and weeks preceding her resignation from CCM and immediate rehiring by Guild, Ms. Casimiro acted as an agent of Guild and worked for Guild's benefit and to CCM's detriment, despite continuing to be employed by CCM.

24. Ms. Casimiro, in active coordination with Guild, engaged in a persistent and repeated course of conduct constituting blatant violations of the above-cited provisions of Ms. Casimiro's Employment Agreement. In furtherance of this effort, Ms. Casimiro, while still employed at CCM, took efforts to convert, export, and appropriate a substantial amount of CCM information, data, and other property for the purpose of benefitting Guild and herself to the detriment of CCM. Information that was taken may have been protected under applicable federal and state laws and regulations,

which CCM is duty bound to protect. On information and belief, they continue to utilize such information for the same purpose.

25. After deciding to leave CCM to join Guild, and while still employed by CCM, Ms. Casimiro took action to utilize CCM information for the benefit of Guild and herself and to the detriment of CCM; failed to hold CCM's information in confidence; used, disclosed, and allowed to be disclosed CCM's information to Guild without CCM's authorization; used CCM's information in a manner which had an adverse effect on CCM's business and the value of such information; directed and diverted business opportunities related to CCM's products or services from CCM to Guild; took action to compete with CCM while still employed by CCM; acted as an agent or employee of Guild while still employed by CCM; and failed to return to CCM all of its information upon termination of her employment; all for the benefit of Guild and herself to the detriment of CCM in violation of Ms. Casimiro's Employment Agreement and common law duties.

26. Upon information and belief, Guild intentionally induced Ms. Casimiro to breach her contractual obligations and duties of loyalty by, among other things, transferring customers, customer data and other confidential information to her personal accounts for subsequent use for the benefit of Guild.

27. As of the date of this filing, CCM has suffered substantial harm, including the substantial resources and investment made in Ms. Casimiro and significant disruption to CCM's Las Vegas, Nevada operations.

28. Examples of the breaches and improper conduct that Ms. Casimiro undertook, while physically located in Las Vegas, with Guild's cooperation, which have been discovered to date include, but are not limited to, the following:

   a. <u>Casimiro Exports CCM Information Via Personal Email and Seeks to Transition Borrowers to Guild.</u> As to hundreds of borrowers or prospective borrowers, Ms.

Casimiro forwarded substantial information to her personal email address. On information and belief, she did this so she would be in a better position to transition such borrowers from CCM to Guild. On information and belief, Ms. Casimiro also transferred loan files for borrowers to Guild. By way of example, and understanding that CCM's investigation is ongoing:

    i. Between August 8, 2020 and January 19, 2021, while employed at CCM, and in preparation for her transition to Guild, Ms. Casimiro sent approximately 10 emails to her personal email account which were accompanied by her commission reports that contained CCM borrower names, loan numbers, and loan amounts.

    ii. Between June 2020 and January 19, 2021, while employed at CCM, and in preparation for her transition to Guild, Ms. Casimiro sent to her personal email account numerous spreadsheets containing the personal information of hundreds of former, current, and prospective CCM borrowers. These lists contained customer names, contact information (phone numbers, emails, addresses, etc.), credit scores, and birthdates.

    iii. In late 2020, in furtherance of her plan to transfer CCM customers to Guild, Ms. Casimiro acted as Guild's agent and gathered protected personal information from at least one borrower [Breen] but failed to enter any such information into CCM's system. Intead, she gathered the information and diverted it to Guild. Upon information and believe, Ms. Casimiro has since closed loans for this customer, as well as for several other CCM customers that were in CCM's pipeline prior to being diverted to Guild by Ms. Casimiro.

29. Without prior warning to CCM, in January 2021, Ms. Casimiro joined Guild.

30. On information and belief, Ms. Casimiro utilized and continues to utilize CCM's confidential information to originate loans in her new role with Guild for the benefit of Guild and her and to the detriment of CCM.

31. On information and belief, Guild has perfected its scheme and will continue to harm CCM unless stopped.



# FIRST CAUSE OF ACTION

## Civil Conspiracy

32. CCM hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

33. On information and belief, Ms. Casimiro was a more desirable candidate for Guild if she had an established book of business that they could immediately start processing at Guild.

34. As such, Guild conspired to encourage Ms. Casimiro to wrongfully remove CCM confidential information from computers physically located in Las Vegas, and divert business related to Las Vegas clients from CCM to Guild.

35. As discussed above, Ms. Casimiro took from CCM contact information for numerous real estate agents and hundreds of CCM's potential borrowers; the public and non-public information relating to hundreds of CCM's potential borrowers who had submitted applications with Guild; and detailed public and non-public information relating to numerous pending loan applicants and current borrowers of CCM.

36. On information and belief, Ms. Casimiro did this in cooperation with Guild with the intent of pursuing those potential CCM customers at Guild for the benefit of Guild and herself.

37. On information and belief, Guild entered into an agreement with Ms. Casimiro pursuant to which it encouraged and enabled her to wrongfully remove CCM's Confidential information.

38. Ms. Casimiro owed fiduciary duties to CCM of good faith and loyalty while employed by CCM. These fiduciary duties are reflected in her Employment Agreement.

39. By engaging in the conduct set forth in the preceding and subsequent paragraphs, Ms. Casimiro, breached her fiduciary duties, statutory duties, and/or duties of loyalty to CCM.



40. Guild actively encouraged Ms. Casimiro in her previously described conduct, and benefited from the transfer of CCM's confidential information, customers, and employees.

41. Guild played an essential role in the conduct of Ms. Casimiro. She would not have removed confidential information or breached her fiduciary duties were it not for Guild's willing participation in the breach as part of an effort to appropriate CCM's business.

42. Guild's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to CCM, including substantial economic harm in the form of damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits, for which CCM seeks compensation by this action.

## SECOND CAUSE OF ACTION

### Tortious Interference with Business Expectancy

43. CCM hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

44. CCM had existing economic relationships with each of its existing and prospective borrowers. Each of those relationships benefitted CCM economically and likely would have continued to benefit CCM economically in the future.

45. Guild was aware of CCM's economic relationships with its existing and prospective borrowers located in the greater Las Vegas area, specifically by virtue of the client information they induced Ms. Casimiro to improperly supply to them, and generally by virtue of their understanding of the mortgage lending business and how it operates with respect to client relationships.

46. CCM is informed and believes that Guild intended to disrupt, and succeeded in disrupting, CCM's Las Vegas area business operations and relationships with its Las Vegas area borrowers by engaging in the conduct set forth in the preceding and subsequent paragraphs.



4873-2347-1393.2

13

47. Guild's interference with CCM's existing and prospective economic relationships with its customers proceeded from an improper motive and by improper means in that it violated established standards within the mortgage profession and sought to harm CCM by appropriating the confidential information and client relationships into which CCM had invested substantial time and expense for Guld's monetary gain.

48. Guild's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to CCM, including substantial economic harm in the form of damage to its relationships with its valued customers, the continuing loss of its competitive position, loss of market share, and lost profits.

### THIRD CAUSE OF ACTION

**Tortious Interference with Contractual Relationships**

49. CCM hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

50. CCM had a valid and enforceable Employment Contract with Ms. Casimiro.

51. At all times, Guild was aware that CCM had a valid and enforceable Employment Contract with Ms. Casimiro.

52. At a minimum, Guild was on notice that it is standard within the mortgage industry for employees to be subject to loyalty and confidentiality agreements.

53. Guild intentionally induced Ms. Casimiro to breach the loyalty and confidentiality provisions of her Employment Contract by, among other things, inducing her to transfer CCM's confidential information to Guild, to divert CCM's clients to Guild, and to act as an agent of Guild during her ongoing employment with CCM.

54. Guild's interference with CCM's employment contract proceeded from an improper motive and by improper means in that it violated established standards within the mortgage lending

profession and sought to harm CCM by appropriating the confidential information, employee training, and client relationships into which CCM had invested substantial time and expense for Guild's monetary gain.

55. Guild's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to CCM, including substantial economic harm in the form of damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits.

## FOURTH CAUSE OF ACTION

### Unfair Competition

56. CCM hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

57. Guild's acts alleged herein constitute unfair, unlawful and/or fraudulent business acts and practices under applicable state unfair business practices statutes because such acts are forbidden by various state and federal laws, unscrupulous, unfair, injurious to CCM, and contrary to the public interest.

58. Specifically, Guild caused confusion for consumers whose loans were in progress with CCM, or who had submitted pre-applications with CCM. These consumers continued to use the same loan originator and then suddenly, their loans were diverted from CCM to Guild.

59. Upon information and belief, Guild also used CCM's confidential information to close loans at Guild.

60. As a direct, proximate, and foreseeable result of Guild's wrongful conduct alleged herein, CCM has suffered, and unless Guild is enjoined from using the wrongfully obtained customer information, will continue to suffer, irreparable injury, including but not limited to



wrongful loss of customers to Guild based on their false and misleading actions and use of CCM's confidential information, for which CCM's remedy at law is inadequate.

61. The public interest would be served by granting the relief sought because it clearly favors preventing institutions such as Guild from engaging in and profiting from unfair business practices as described herein.

62. Guild's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to CCM, including substantial economic harm in the form of damage to its relationships with its valued customers and employees, the continuing loss of its competitive position, loss of market share, and lost profits, for which CCM seeks compensation by this action.

## FIFTH CAUSE OF ACTION

### Injunctive Relief

63. CCM hereby alleges and incorporates by reference each and every allegation in all preceding and subsequent paragraphs as if fully set forth herein.

64. By reason of Guild's above-described misconduct and continuous scheme to systematically, methodologically, and purposefully pilfer CCM's employees and encourage them to use and/or disclose CCM's confidential information, Guild has caused and will continue to cause CCM to suffer irreparable harm for which there is no adequate remedy at law. Money damages cannot adequately compensate CCM for those losses, even if Guild were able to respond in payment of money damages.

65. CCM is substantially likely to succeed on its claims against Guild due to Guild's pervasive interference with CCM's contracts and business relationships. The threat of harm to CCM in the absence of injunctive relief far outweighs the threat of harm to Guild if an injunction is granted.



66. CCM faces substantial, but difficult to calculate, financial loss and loss of good will, whereas the only "hardship" imposed on Guild is to prevent them from reaping any illicit gain or benefit from their misconduct.

67. For these reasons, and those set forth in the preceding and subsequent paragraphs, CCM is entitled to preliminary and/or permanent injunctive relief. Accordingly, CCM requests that Guild be enjoined from: using, sharing, summarizing, discussing, or communicating in any manner concerning or otherwise making use of any of CCM's proprietary, and/or confidential information, and ordering them to affirmatively identify and return any of CCM's proprietary and/or confidential information under Guild's or its current employees' control.

## **PRAYER FOR RELIEF**

WHEREFORE, CCM prays for the following relief:

1. For permanent injunctive relief, including but not limited to:

   (a) Requiring Guild to preserve all confidential, proprietary, or protected CCM information in their possession and any or communications related to the allegations set forth herein;

   (b) Restraining and enjoining Guild, its agents, servants, and employees, and all other persons acting in concert or participating with it from disclosing or utilizing any confidential, proprietary, or protected information obtained from CCM including, but not limited to, the identity and other information of CCM's customers; and/or;

   (c) Requiring Ms. Casimiro and/or Guild to return any confidential, proprietary, or protected information or other property or information of CCM wrongfully taken from CCM.

2. For compensatory and general damages according to proof;

3. For special damages according to proof;



4. For consequential damages according to proof;

5. For punitive and exemplary damages according to proof;

6. For prejudgment interest at the maximum legal rate;

7. For costs of the proceedings herein;

8. For attorneys' fees as provided by statute and by agreement; and

9. For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, CROSSCOUNTRY MORTGAGE, LLC, exercises its right under the United States Constitution and applicable statutes, and hereby demands a jury trial of all of the issues in the above-entitled action which are triable by jury.

DATED this 27th day of May, 2022.

LEWIS BRISBOIS BISGAARD & SMITH LLP


By      /s/ *Marc S. Cwik*
MARC S. CWIK
Nevada Bar No. 006946
6385 S. Rainbow Boulevard, Suite 600
Las Vegas, Nevada 89118
Tel. 702.893.3383

*Attorneys for Crosscountry Mortgage LLC*

4873-2347-1393.2                                18